Filed 4/8/22  L.H. v. Super. Ct. CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| L.H.,<br><br>      Petitioner,<br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>      Respondent,<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, et al.,<br><br>      Real Parties in Interest. | A164376<br><br>(Contra Costa County<br> Super. Ct. No. J2100376) |

        L.H. (mother)[1] seeks extraordinary writ relief from a January 13, 2022 order that denied her reunification services for her seven-year-old son K.H. (the child) and set a hearing to consider termination of her parental rights and the child's permanent placement under Welfare

_____

[1]      The child's father is not a party to this writ proceeding.

1

and Institutions Code section 366.26.[2]  Pending our resolution of the petition, mother requests a temporary stay of the section 366.26 hearing set for May 5, 2022.  Real party in interest Contra Costa County Children and Family Services Bureau (agency) opposes the petition.

Mother challenges the juvenile court's denial of reunification services under section 361.5, subdivisions (b)(10) and (b)(11).  Under this statute, in pertinent part, the court "need not" provide reunification services for a child when a parent's reunification services or parental rights have been terminated in an earlier proceeding concerning a half-sibling and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal" of the half-sibling.  (*Id*., subds. (b)(10) & (11).)  Once a court has found that a parent is described in subdivision (b)(10) or subdivision (b)(11) of section 361.5, it "shall not order reunification" for the parent unless it further "finds, by clear and convincing evidence, that reunification is in the best interest of the child."  (*Id*., subd. (c)(2).)  Mother does not challenge the juvenile court's finding that she was a person described in subdivisions (b)(10) and (b)(11) of section 361.5.  She challenges only the court's denial of services after finding reunification would not be in the child's best interest.  We deny the petition for an extraordinary writ on the merits and deny as moot the related request for a temporary stay of the section 366.26 hearing.

---

[2]     All undesignated statutory references are to the Welfare and Institutions Code.

2

**FACTS**

In August 2021, the agency took K.H. into protective custody, and filed a section 300 petition (later amended), based on allegations that (1) mother had serious and unresolved mental health issues that placed the child at substantial risk of abuse or neglect (§ 300, subd. (b)) and (2) mother had failed to reunify with K.H.'s older half-sibling D.M., "due to physical abuse;" mother's parental rights had been terminated on August 31, 2007 and D.M. had been adopted on June 23, 2008 (§ 300, subd. (j)). The detention/jurisdiction report noted the agency had received a report that mother had been diagnosed with "Bipolar Disorder and possibly Schizophrenia;" she was "not taking medication to stabilize;" she had been observed displaying increasingly irrational and paranoid behavior by family members, school personnel, law enforcement, and agency workers; and she had refused to seek treatment and said her mental health was fine and she had no problems.

At the detention hearing, the juvenile court found the child came within sections 300, subdivisions (b) and (j), and ordered the agency to retain custody of the child; the child was placed in the home of his maternal grandmother, who had adopted the child's half-sibling. Mother was granted supervised visits of a minimum of two one-hour visits each week, subject to a consideration of the child's wishes. Additionally, the court directed the agency to provide the following services to mother: alcohol and drug testing; parenting education; mental health assessment; and counseling. Thereafter, on September 9, following an in-camera hearing, the court found it was necessary to appoint mother a guardian ad litem, and did so the next day. At the

3

jurisdiction hearing held on October 7, 2021, the court sustained the petition, as amended, and K.H. was adjudged a dependent of the court.

Before the January 13, 2022 disposition hearing, the agency filed an initial disposition report. When the case was continued, the agency filed a memorandum to provide the court with an update regarding the family.

The agency recommended the court deny mother reunification services based on her failure to reunify with the child's half-sibling D.M. under section 361.5, subdivisions (b)(10) and (11). While the report did not attach D.M.'s case file, the agency provided the following details: "In [mother's] prior child welfare case, [mother's] family was brought to the attention of the Bureau due to [mother] striking her infant child, [D.M.], and then [mother] was hospitalized for a psychiatric evaluation. [Mother] has a history of learning disabilities which entitles her to Social Security Disability Insurance. [Mother] has a history of substance abuse and unaddressed mental health issues. [¶] [Mother] failed to reunify with . . . [D.M.], despite receiving eighteen months of Family Reunification Services to stabilize her mental health. [D.M.] was detained on or about April 18, 2005 and Family Reunification Services were ordered on July 21, 2005. [Mother] was ordered to complete parent education classes, domestic violence therapy, individual therapy, a psychiatric evaluation, and drug testing. Per Status Review Report dated June 5, 2006: on May 16, 2006, [Mother's] individual therapist . . . terminated her therapy services due to excessive absences. Per the Status Review Report dated October 5, 2006, [Mother] denied the need for mental health services and she had been discharged from [a program] on August 28, 2006 due to poor

4

attendance. [Mother's] participation in substance abuse testing dropped and she tested one time out of six in the months of June 2006 and August 2006. During her medication evaluation on November 21, 2005 [it was] reported that [Mother] was defensive, in denial, blamed her problems on stress, and stated that 'everything in those reports is a lie.' [Mother] receives Supplemental Security Income every month due to a mental health disability, but she states that she does not know why she is eligible for this benefit and denies having a diagnosis. [Mother] did not complete her psychiatric evaluation. Family Reunification Services were terminated on April 6, 2007. Parental rights were terminated on August 31, 2007. The child was adopted and the case was vacated and dismissed on June 23, 2008."

The agency also reported on the family's circumstances since the October 2021 jurisdiction hearing. The agency social worker had made several attempts to engage mother in the court ordered recommended case plan services. On October 4, November 2, December 1, 2021 and January 3, 2022, the agency social worker mailed mother letters with case plan service referrals for counseling, drug testing, substance abuse intake, and parent education. On November 11 and December 8, 2021, the agency provided mother with the case plan service referrals during mother's in-person visits with the child. However, mother failed to return the agency social worker's telephone messages, refused to meet with the worker, and did not provide the agency with any verification that she was enrolled or participating in case plan services. The agency social worker reported that mother said she would relinquish her parental rights before working with the agency to address her unmet mental health needs.

The agency also reported on K.H.'s circumstances since his out-of-home placement. "During bimonthly meetings with [the child] and the caregiver, it is reported that [the child] is doing very well in placement and is 'living his best life.' " However, the caregiver was concerned that the child had been displaying signs of aggression toward a younger cousin, was fidgety in the home, had bouts of being withdrawn, chewed on his shirt, did not consistently bathe due to fear of water, and had night terrors during which he talked, yelled, and punched in his sleep. The child reported that when in his mother's care she hit him with electrical cords if she felt like he was acting " 'suss' (suspicious)." The child never knew what would cause his mother to hit him, just that it happened whenever the voices told her something. The child also reported that his mother did not allow him to go outside and always kept him at her side "as she was paranoid about the voices and people coming into the home." Based on the recommendation of the child's pediatrician that the child should receive mental health services, the agency social worker arranged for those services. On December 9, 2021, the child had an intake therapeutic appointment and he was on a waitlist for a therapist as of January 13, 2022.

The agency initially provided mother with telephone visits with the child and supervised in-person visits began on November 5, 2021. In its report and memorandum, the agency social worker described certain in-person visits (November 5, December 8, December 15, and December 22, 2021), and described mother's responses when her scheduled visits had been canceled due to her failure to give the agency one-day prior notice that she would be attending the visit.

6

On January 13, 2022, the juvenile court held a contested disposition hearing. It considered the agency's disposition report and memorandum, the testimony of the agency social worker, and counsels' arguments.

The agency social worker testified that the agency had arranged for a Child Family Team (CFT) virtual meeting on November 12, 2021. Mother was encouraged to attend the meeting and told she could attend in person, but she did not attend. Mother stated she was not going to participate in any services and the agency was making it harder for her.

The agency social worker also testified concerning mother's mental health issues. The agency report indicated that mother had a learning disability for which she received "SSI," but the agency social worker was not able to make any determination as to nature of the disability. The agency social worker had tried to ask mother questions about her mental health providers, but mother's response was that she had no mental health issues and did not see anyone.

The agency social worker also described the visits between mother and child. In general they "seem[ed] to get along well," sometimes they played basketball together, did "high-5s," on one occasion made paper airplanes, and on one occasion the child wrote on a whiteboard, " 'I love you, ' " and mother wrote back, " 'I love you more.' " However, during several visits mother experienced hearing voices or responding to internal stimuli, and during one visit the child became upset because of mother's behavior.

When asked if K.H. had been living with mother "fairly successfully," the worker replied, "He has been living with her, yes."

The agency social worker also reported that although there were a few calls to the agency for welfare checks, which were based on "unfounded allegations," this juvenile dependency was the first time the agency had "really intervened" with the family. While the child was "considered to be pretty healthy," he had not seen a dentist for over two years and had not seen a doctor. On cross-examination, the agency school worker confirmed the child had not attended the entire school year for first grade.

The agency social worker was also questioned about the agency's recommendation that mother should not receive reunification services based on her failure to reunify with the child's half-sibling who was then 17 years old. While mother physically abused the half-sibling as a baby, mother's behavior was due to her "mental illness," and her case plan required her to participate in a "psych evaluation" and mental health services. To the agency social worker's knowledge, mother had not participated in those services.

At the conclusion of the evidentiary phase of the hearing, the court heard counsels' argument. The child's counsel argued for reunification services because the child had lived with mother for seven years, they had a strong bond though "[i]t wasn't perfect," mother tried to be involved, the child knew his mother very well, services would allow mother to effectively care for the child, and there was no rush for permanency because the maternal grandmother was not interested in legal guardianship or adoption of the child. Mother's counsel similarly argued for reunification services for the following reasons: (1) significant time had elapsed between the two juvenile dependency cases and mother had cared with K.H. for seven years without agency

8

intervention; (2) while the prior juvenile dependency case had concerned mother's mental health issues, whatever problems she might have had did not prevent her from maintaining her own apartment and caring for K.H. since his birth until he was removed by the agency; and (3) for the last two years many people had been isolated and disoriented due to the global pandemic, which might have affected mother more than other people, and "that may be what we're looking at here." Mother's counsel also argued that visits had gone well, the child enjoyed and looked forward to the visits once he was assured the visits would be in a place where he could feel comfortable, and the court should not sever the relationship and make a permanent plan at that time.

Agency counsel argued that there was no dispute that the provision for the bypass of services applied in this case and there was no attempt by mother to take steps to treat her mental health or to make any changes in the circumstances that led to the agency's intervention. Mother could not demonstrate, by clear and convincing evidence, that providing her with services would be in the child's best interests as there was a "complete and utter disregard for what the underlying concerns are," and until there was some "recognition" of those concerns the child was "in a situation of flux and uncertainty," and it would serve no purpose to order services for a parent who did not believe she needed them.

The juvenile court adjudged K.H. to be a dependent of the court, pursuant to section 300, subdivision (b)(failure to protect). The agency was granted custody of the child for out-of-home placement, reunification services for both parties were denied, and the case was set

9

for a section 366.26 hearing to consider termination of parental rights and permanent placement for the child.

The juvenile court explained its reasons for finding that the denial (bypass) of reunification services for mother was warranted in this case as follows:

"First, as to the testimony, I do credit [the agency social worker's] testimony today.

"Factually, the information I have from the reports and the testimony is that [mother] did have a child welfare case starting in 2005 with her then-three-month-old child, [D.M.], because [mother] struck the baby in the face for crying too much. And when taken to the medical care, the baby had two black eyes and a linear bruise. [¶] The child [D.M.] was removed from [mother] based on [her] mental health posing a danger to the baby. [¶] The mother did not then, and has not since then, acknowledged the fact that she does have mental health issues or addressed those mental health issues. And the report suggests that she does have a bipolar condition and possible schizophrenia. [¶] In the prior case, family reunification services were terminated on April 6th, 2007, and [mother's] parental rights were terminated August 31st, 2007, leading to the adoption of the first child.

"Evidence is consistent and clear that [mother] has not made any efforts, much less reasonable efforts, to treat the problem that led to this removal and to the termination of parental rights for her.

"As to [K.H.], the evidence shows that the mother keeps [K.H.] in the home at all times and does not allow him to play outside or see family members. As [the agency social worker] testified, [K.H.] did not attend school at all in . . . 2020 and 2021. So he did miss his entire 1st grade. [¶] My understanding is that the mother did not enroll him in school this fall, but the grandmother . . . attempted to enroll him in school. And when she did so, the mother charged in and took [the child] out of school saying, 'Don't let them touch you or rape you or touch your food.'

"Throughout the pendency of this case, the mother has refused to engage in services or . . . engage with the [agency] at all or to begin

10

participating in services. She said at one point that she stays at home and drinks a bottle of wine. [¶] Today's memorandum indicates that she has failed to appear for every scheduled drug test.

"The report also indicates that the mother beats [K.H.] with an electrical cord whenever the voices tell her that he is acting suspiciously. And [the child] is understandably left confused because he doesn't know what he did to cause his mother to beat him. [¶] [K.H.] . . . . is displaying signs of aggression and is sometimes fidgety, sometimes withdrawn. He does not bathe consistently due to fear of water. And he chews his shirt and has night terrors.

"I do understand that [mother's] visits with [K.H.] are, in some respects, positive interactions and beneficial to [the child], but there's also evidence that the mother is responding to internal stimuli during the visits, and [the child] knows that and is scared by his mother's behavior during some of the visits. [¶] The mother did at one point say that she would relinquish her parental rights before working with the [agency] on this case.

"There is no question that the statutory elements of a bypass have been met. And the question is whether I can find by clear and convincing evidence that reunification would be in the best interest of the child. [¶] And I do not find that to be the case. In fact, I find that reunification would not be in [the child's] best interests.

"Mother's mental health issues do place [the child] at serious risk of physical and emotional abuse. The mother has not addressed those issues over the last 16 years and has consistently refused to seek mental health treatment and does so to this day, because she denies having any mental health issues that need treatment.

"So providing services is not going to benefit [the child] or [mother] until she's able to avail herself of those services. And there's simply no evidence that she ever has or ever will avail herself of mental health services, which was what would be necessary to keep [the child] safe with his mother. [¶] . . . [¶]

"However, visitation will continue so [the child's] desire to have visitation with his mother in a safe environment will be honored. So I'm not putting off his contact or visitation with his mother, but I don't

11

see how providing services is going to benefit [the child] under the circumstances."

## DISCUSSION

## I.    Applicable Law

As a general matter, when children are removed from the custody of their parents, reunification services must be offered unless a statutory exception applies.  (§ 361.5, subd. (a).)  Under section 361.5, subdivision (b), the juvenile court "need not" provide reunification services when the parent has previously failed to reunify with a child's sibling or half-sibling and the court finds, by clear and convincing evidence, either of the following: (1) a parent's court-ordered reunification services were terminated after the parent failed to reunify with the sibling or half-sibling and the parent subsequently did not make reasonable efforts to treat the problem that led to removal (*id.*, subd. (b)(10)); or (2) a parent's parental rights over a child's sibling or half-sibling were terminated and the parent subsequently did not make reasonable efforts to treat the problem that led to removal (*id.*, subd. (b)(11)).

If a parent is found to be described by subdivision (b)(10) or subdivision (b)(11) of section 361.5, the juvenile court "shall not" order reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).)  In other words, once the court determines a parent is one described in subdivision (b)(10) or subdivision (b)(11) of section 361.5, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources," ' " and "the burden is on the parent to

12

change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).)

## II. Substantial Evidence Supports Finding that Mother Had Not Made Reasonable Efforts to Address Problems that Led to Removal of Child's Half-Sibling D.M.

While a parent's reasonable efforts necessary to avoid the denial of reunification services "are not synonymous with ' "cure," ' . . . not every 'effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render [section 361.5, subdivision (b)] inapplicable. It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made.' " (*Jennifer S. v. Superior* Court (2017) 15 Cal.App.5th 1113, 1121; italics in original (*Jennifer S.*).)

In reviewing the juvenile court's finding of reasonable efforts, we "determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by" the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, fn. omitted.) We do not "reweigh the evidence itself," or "insert [our] views regarding the credibility of witnesses" for those of the juvenile court; rather we "view the record in the light most favorable" to the

13

juvenile court's order, indulging all "reasonable inferences" that the juvenile court may have drawn from the evidence and accepting the juvenile court's resolution of conflicting evidence. (*Id*. at p. 1008.)

Mother contends the juvenile court erred in finding she had not made reasonable efforts to treat the problem that led to the removal of the child's half-sibling D.M. given the length of time between the earlier case and the current case. We find the argument unavailing. The juvenile court was well aware of the length of time between the earlier juvenile dependency regarding D.M. and the current juvenile dependency regarding K.H. The fact that no juvenile dependency petitions were filed during the first seven years of the child's life did not require the court to infer that mother had "made progress" in addressing her mental health issues. Whether mother's circumstances at the time of the January 13, 2022 hearing showed she had made reasonable efforts to address the problems that had led to the earlier juvenile dependency proceeding was a question for that court after a consideration of the documentary evidence and the testimony of the agency social worker.

Mother argues, however, that a reversal is required due to insufficient information regarding the basis for the removal of the child's half-sibling D.M. and that she should be provided the mental health services she did not receive in D.M.'s case. In support of this contention, mother asserts the agency did not produce the case files of the earlier dependency proceeding, and that at the contested hearing " 'the testifying social worker should have thoroughly reviewed the prior records, interviewed the parents regarding past efforts, and [been] able to speak authoritatively as to why the parent at issue has failed to

14

make reasonable efforts during the relevant time frame,' " quoting from *Jennifer S., supra,* 15 Cal.App.5th 1113 at page 1126.

We see no merit to mother's "lack of evidence" argument because it misconstrues our authority as an appellate court. "The rule is well settled that in examining the sufficiency of evidence to support a questioned finding, [we] . . . must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. [Citation.] There is no corollary to this rule which authorizes [us] . . . to draw inferences from the absence of evidence to overturn the questioned finding." (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813.) Here, the agency's documentary and testimonial evidence informed the juvenile court as to the circumstances of the prior dependency concerning D.M. and the circumstances concerning the current dependency regarding K.H. If it was mother's position that the court did not have sufficient evidence as to the nature of the problem that led to D.M.'s removal, the nature of reunification services she had been previously offered in the earlier dependency, and any efforts she had made in the ensuing years to correct the problems that led to that earlier dependency, she could have "introduced [her] own evidence on the issue[s]. . . . [F]or [her] to now make this argument amounts to nothing more than an attempted sandbagging of the [juvenile] court. This we cannot tolerate." (*Ibid.*)

We also are not persuaded by mother's argument that the juvenile court should have considered her "mental illness" as the " 'starting point' " for reunification services. *In re K.C.* (2012) 212 Cal.App.4th 323 (*K.C.*) and *Patricia W. v. Superior Court* (2016) 244

15

Cal.App.4th 397 (*Patricia W.*) are factually inapposite as they concern whether an agency made reasonable efforts to provide reunification services for a parent with mental health issues who was willing to participate in those services. (See *K.C.*, *supra*, at p. 425; *Patricia W.*, *supra*, at p. 327.) Here, we are concerned with whether mother is entitled to reunification services in the first instance. The record shows the agency social worker made repeated efforts by telephone, letter, and in person contact to discuss mother's participation in services and to make referrals. The worker's efforts were met by mother's complete denial of any mental health problems and the need for any referrals. " 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 (*Nolan W.*).) Our dependency law does not require the agency to "take the parent by the hand" to force acceptance of services they do not want. (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) "A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior . . ., the legislative purpose of providing safe and stable environments for children is not served by forcing juvenile courts to go 'on hold' while the parent makes another stab at compliance." (*Ibid.*)

## III. Juvenile Court Did Not Abuse Its Discretion in Finding Reunification Was Not in K.H.'s Best Interest

When making the best interest determination under section 361.5, subdivision (c)(2), the juvenile court must decide whether a parent has shown that the child would benefit from court-ordered

reunification services, after a consideration of " 'the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.' " (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1124, quoting *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.) We review the juvenile court's best interest ruling for an abuse of discretion. (*Jennifer S.*, *supra*, at p. 1124.)

In challenging the juvenile court's finding that reunification services would not be in K.H.'s best interest, mother argues that at the time of the January 13, 2022 hearing she had "at most five months" to make efforts toward reunifying with the child, and her mental health issues, which were not truly evaluated, most likely prevented her from engaging in services; her history was minimal in that she failed to reunify with the child's half-sibling 14 or 15 years ago with no incidents until the petition in this case was filed; K.H. was thriving, the bonds between K.H. and mother and K.H. and his caregiver "were significantly high," as they were family; and it is likely reunification would be successful in this case "with a strong focus on her mental health," as she had raised the child for seven years and had a strong support system. We find the argument unavailing.

In evaluating the juvenile court's best interest ruling, we consider only the evidence that supports the decision that reunification would not be in the child's best interest, and not evidence that would support a contrary finding in mother's favor. Before services are offered to a parent who need not be provided them under section 361.5, "[t]here must be some 'reasonable basis to conclude' that reunification is possible." (*William B.*, *supra*, 163 Cal.App.4th at pp. 1228-1229,

17

quoting in part *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.) Here, the juvenile court considered the factors cited by mother, including her relationship with K.H., but found in effect that reunification was not possible because mother had given no indication she was willing to participate in services necessary to address the agency's concerns. "To reverse this determination, we would . . . be required to conclude that the juvenile court had abused its discretion. This we decline to do." (*Jennifer S., supra,* 15 Cal.App.5th at p. 1125.) "While reunification is the preferred outcome when it serves the interests of both parent and child, no interest is well served by compelling inadequate parents to shoulder responsibilities they are unwilling to accept or unable to discharge." (*Nolan W., supra*, 45 Cal.4th at p. 1234.) Having reviewed the record, we see no basis to set aside the juvenile court's decision to deny mother services on the basis that reunification would not be in K.H.'s best interest.

## IV.    Conclusion

We deny mother's petition for writ relief as she has failed to meet her appellate burden of demonstrating error or an abuse of discretion in the juvenile court's denial of reunification services.

### DISPOSITION

The petition for an extraordinary writ is denied on the merits. (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h).) The request for a temporary stay is denied as moot. Our decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i) & 8.490(b).)

18

                                          _____

                                          Petrou, J.

WE CONCUR:

_____

Tucher, P.J.

_____

Fujisaki, J.

*A164376/L.H. v. Superior Court of Contra Costa County*